FILED
United States Court of Appeals
Tenth Circuit

March 24, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　Plaintiff - Appellant,

v.

BENJAMIN RAYMOND,

　　　Defendant - Appellee.

No. 09-2101
(D.C. No. 1:07-CR-00748-MCA-2)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **EBEL** and **GORSUCH**, Circuit Judges.

The United States appeals the district court's decision to dismiss an indictment charging Defendant-Appellee Benjamin Raymond with several violent crimes allegedly undertaken as part of his membership in the Aryan Brotherhood. The district court dismissed the indictment after finding that an earlier plea agreement between Raymond and the United States precluded the United States Attorney's Office for the District of New Mexico from pursuing these charges. Having jurisdiction pursuant to 18 U.S.C. § 3731, we AFFIRM in part, REVERSE in part, and REMAND this case to the district court.

_____

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. FACTUAL BACKGROUND

This appeal involves two federal criminal prosecutions.

**A.      Raymond's 2003 federal prosecution for being a previously convicted felon in possession of a firearm**

In October 2003, a federal grand jury in New Mexico indicted Raymond on one count of being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  This charge stemmed from an incident occurring on June 29, 2002, when Albuquerque police officers arrested Raymond and another individual, Josie Robinson, for trying to buy a car using fraudulent checks.  Raymond and Robinson were an unlikely pair to find together because, one week earlier, Robinson had reported to officers from the nearby Rio Rancho, New Mexico, police department that her boyfriend, Henry George, was missing and that she suspected Raymond and his associates, Travis Dally and Bradley Wasson, of foul play.  At the time of his June 29 arrest by Albuquerque police, Raymond, a previously convicted felon, was found in possession of two firearms.  This led to Raymond's 2003 federal prosecution for being a felon in possession of a firearm.

To resolve that case, Raymond entered into a plea agreement with the United States on October 14, 2004.  Pursuant to the agreement, Raymond pled guilty to the single charged offense, in exchange for the Government's promise that:

10. Provided that the defendant fulfills his obligations as set out above, . . .

a.  The United States will not bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico.

11. This agreement is limited to the United States Attorney's Office for the District of New Mexico ["USAO"] and does not bind any other federal, state, or local agencies or prosecuting authorities.

(Aplt. App. at 44.)  The district court sentenced Raymond to fifteen years in prison.

## B.  Raymond's 2007 federal prosecution for a weapons offense and violent crimes committed in aid of racketeering

In 2007, a federal grand jury in New Mexico charged Raymond and three others, Bradley Wasson, Travis Dally and Jeremiah Looney, with weapons offenses and violent crimes committed in aid of racketeering.  The controlling superseding indictment specifically alleged the following:  Bradley Wasson was the head of one faction of the Aryan Brotherhood in New Mexico.  Raymond, Dally and Looney were members or prospective members of Wasson's Aryan Brotherhood faction.  A prospective member is one who is serving a probationary period, but who is nevertheless "considered part of the Aryan Brotherhood family."  (Id. at 18.)  The Aryan Brotherhood engages in racketeering activity, such as "acts of violence, and other criminal activities, including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics and firearms trafficking," as well as identity theft and check fraud, which "are the most prevalent non-violent crimes committed by the Aryan Brotherhood."  (Id. at 15, 17.)

The superseding indictment further alleged that, in order "to advance the status of the Aryan Brotherhood" (id. at 23), as well as their own positions within that

3

organization, Wasson, Raymond and Dally conspired to kidnap and murder Henry George, another Aryan Brotherhood prospect, because he had contacted police. And one of the rules of the Aryan Brotherhood is "that any member assisting law enforcement authorities must be killed." (Id. at 21.) Therefore, according to the indictment, Wasson, Dally and Raymond went to George's apartment in Rio Rancho, New Mexico, on June 20, 2002, and assaulted George until he confessed to contacting police. Wasson then ordered that George be killed. Members of the Aryan Brotherhood "are required, when ordered, to kill without hesitation. Members who do not fulfill their obligations to the Aryan Brotherhood are themselves subject to violent acts, to include murder." (Id. at 18.) Pursuant to Wasson's order, Dally and Raymond took George to a remote area of Rio Rancho, New Mexico, killed him and buried his body in the desert.

The indictment also alleged that, in order to prevent John Mudersbach, another Aryan Brotherhood prospect, from talking to police about George's murder, Dally and Raymond later ordered Brotherhood member Jeremiah Looney to murder Mudersbach. Looney tried to kill Mudersbach, but failed to do so.

Based upon these allegations, the federal grand jury charged Wasson, Dally and Raymond with four counts of committing violent crimes in furtherance of racketeering activity in connection with George's murder: **Count 1**, conspiring to murder George, in violation of 18 U.S.C. § 1959(a)(5); **Count 2**, murdering George, in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2; **Count 4**, conspiring to kidnap George, in violation of § 1959(a)(5); and **Count 5**, kidnapping George, in violation of § 1959(a)(1)

4

and 18 U.S.C. § 2.[1]  The grand jury also charged several weapons offenses:  **Count 3** charged Wasson, Dally and Raymond with carrying and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1).[2]  And **Count 6**

---

[1] 18 U.S.C. § 1959 provides, in pertinent part:

> (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished --
>
>> (1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;
>>  . . . .
>>
>> (5) for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both . . . .

18 U.S.C. § 2 further provides: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal," and "(b) [w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

[2] Section 924 provides, in pertinent part, that

> any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, . . . shall, in addition to the punishment provided for such crime of violence . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

5

charged only Wasson with being a felon found in possession of a firearm on the day following George's murder. Finally, **Counts 7 and 8** charged Raymond, Dally and Looney with committing two additional violent crimes in furtherance of racketeering activity: conspiring and attempting to murder Mudersbach, in violation of 18 U.S.C. §§ 2, 1959(a)(5). The superseding indictment also alleged that there existed "SPECIAL FINDINGS," see 18 U.S.C. §§ 3591-92, that would make Wasson, Dally or Raymond eligible for a death sentence if a jury convicted them, under 18 U.S.C. § 1959(a)(1), of murdering George in furtherance of racketeering activity, or of carrying a firearm in furtherance of a violent crime causing death, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (j)(1).

Raymond moved for the dismissal of all of the counts the superseding indictment charged against him, asserting that the USAO knew about his conduct underlying these offenses at the time the USAO previously entered into the plea agreement with him to resolve the 2003 felon-in-possession charge, which plea agreement promised that the USAO would not bring additional charges against him "arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico" (Aplt. App. at 44). After conducting an evidentiary hearing, the district court

18 U.S.C. § 924(c)(1)(A)(iii). But "[a] person who, in the course of a violation of subsection (c), causes the death of a person through use of a firearm, shall—(1) if the killing is a murder . . . , be punished by death or imprisonment for any terms of years or for life." Id. § 924(j)(1).

6

agreed with Raymond. The court, therefore, dismissed the superseding indictment against him, but without prejudice "[b]ecause the plea agreement in [Raymond's 2003 federal felon-in-possession case] does not bind state or federal agencies other than the USAO for the District of New Mexico [and so] the dismissal of these charges does not necessarily preclude similar charges brought by another agency." (Id. at 173.) The United States appeals. See 18 U.S.C. § 3731.

## II. STANDARD OF REVIEW

This court generally "review[s] the district court's dismissal of an indictment for an abuse of discretion." United States v. Todd, 446 F.3d 1062, 1067 (10th Cir. 2006); see also United States v. La Cock, 366 F.3d 883, 888 (10th Cir. 2004). "Abuse of discretion is established if the district court's [dismissal] is based upon an error of law or a clearly erroneous finding of fact." United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1116-17 (10th Cir. 1998) (quotation, alteration omitted).

This court will "review de novo a claim that the government has breached a plea agreement." United States v. Villa-Vazquez, 536 F.3d 1189, 1196 (10th Cir. 2008); see also Allen v. Hadden, 57 F.3d 1529, 1534 (10th Cir. 1995) ("Whether government conduct has violated a plea agreement presents a question of law we review de novo."). This court will review for clear error, however, any underlying factual findings. See United States v. Elashyi, 554 F.3d 480, 501 (5th Cir. 2008), cert. denied, 130 S. Ct. 57, 61, 363 (2009). In doing so, we "construe the evidence in the light most favorable to the

7

district court's ruling." United States v. Winder, 557 F.3d 1129, 1133 (10th Cir.), cert. denied, 129 S. Ct. 2881 (2009).

"[R]eview under the 'clearly erroneous' standard is significantly deferential." Concrete Pipe and Prods. of Calif., Inc. v. Constr. Laborers Pension Trust for S. Calif., 508 U.S. 602, 623 (1993). Importantly,

> [i]t is not the role of an appellate court to retry the facts, because the [district] court . . . has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from the facts established, and resolving conflicts in the evidence. That the record supports a view of the evidence that is permissible but contrary to the trial court's findings is not sufficient to warrant upsetting the lower court's findings. Instead, findings of fact are clearly erroneous when they are unsupported in the record, or if after our review of the record we have the definite and firm conviction that a mistake has been made.

Holdeman v. Devine, 572 F.3d 1190, 1192 (10th Cir. 2009) (quotations, citations, alterations omitted).

Raymond bore the burden of proving, by a preponderance of the evidence, "the underlying facts establishing" that the Government breached the plea agreement. Cunningham v. Diesslin, 92 F.3d 1054, 1059 (10th Cir. 1996).

### III. DISCUSSION

"Where the Government obtains a guilty plea which is predicated in any significant degree on a promise or agreement with the U.S. Attorney, such promise or agreement must be fulfilled to maintain the integrity of the plea." United States v. Bullcoming, 579 F.3d 1200, 1205 (10th Cir. 2009) (quotation omitted); see also Santobello v. New York, 404 U.S. 257, 262 (1971). While courts rely on general

8

contract law when interpreting a plea agreement, see Bullcoming, 579 F.3d at 1205; see also Puckett v. United States, 129 S. Ct. 1423, 1430 (2009), such an agreement, nevertheless, "is not simply a contract between two parties. It necessarily implicates the integrity of the criminal justice system." Villa-Vazquez, 536 F.3d at 1199 (quotation omitted). As such, a plea agreement is also "a matter of constitutional due process," and "an amalgam of constitutional, supervisory, and private contract law concerns." Id. (quotations omitted). Thus, "the government has a heightened responsibility that extends beyond the plea negotiation to all matters relating to the plea agreement." Id. (quotation, alteration omitted).

> A defendant waives numerous constitutional rights when he enters into a plea agreement with the government. As part of this bargain, the government must stay faithful to its promises to the defendant. Where . . . the government falls short of its promise, a correction is required to preserve the integrity of the criminal justice process, and the public's faith in this integrity.

United States v. Cudjoe, 534 F.3d 1349, 1357 (10th Cir. 2008) (quotation, citations, alterations omitted).

**A. Whether the United States breached the 2004 plea agreement by charging Raymond in the 2007 indictment with the five offenses stemming from George's murder**

We address first the five charges against Raymond stemming from the disappearance and murder of George: Counts 1, 2, 4 and 5, charging that Raymond conspired to, and did, kidnap and murder George in furtherance of racketeering activity, and Count 3, alleging that Raymond used and carried a firearm in relation to these

9

crimes. The district court found that the USAO knew, on or before October 14, 2004---the date on which Raymond entered into a plea agreement with the USAO resolving the 2003 felon-in-possession charge---of Raymond's conduct linking him to the disappearance of Henry George.[3] The district court based that finding on several different categories of evidence.

### 1.   Defense Attorney Gonzales' testimony

The district court found that "the most direct evidence" on this issue was Public Defender Benjamin Gonzales' testimony. (Aplt. App. at 166-67.) Gonzales represented Raymond in the 2003 felon-in-possession prosecution. In that case, the grand jury charged Raymond in October 2003; plea negotiations occurred beginning in April 2004; and Raymond pled guilty to that offense on October 14, 2004. There is no dispute that, several weeks after Raymond's guilty plea, the assistant United States attorney ("AUSA") handling the case, Louis Valencia, acquired information indicating that Raymond was a suspect in George's disappearance. In fact, Valencia used that information at sentencing to argue, unsuccessfully, that Raymond, who had been free on bond, should not be allowed to surrender voluntarily, but instead should be taken into

---

[3] In interpreting the relevant provision of the plea agreement, the district court correctly rejected the Government's argument that "known" meant that the Government, on October 14, 2004, knew that Raymond had committed a particular crime, and rejected as unreasonable the Government's understanding that this provision in the plea agreement was limited to the USAO's knowledge of Raymond's conduct underlying only the 2003-04 felon-in-possession charge. The plea agreement's language does not support this interpretation urged by the Government.

10

custody immediately after the sentencing hearing because "Mr. Raymond was suspected of a murder in Rio Rancho, New Mexico." (Id. at 543.) The question for the district court was whether the USAO knew, before Raymond's October 14, 2004 guilty plea, that he was a suspect in Henry's disappearance.

Gonzales testified, in support of Raymond's motion to dismiss the 2007 indictment, to the following:

> Q  Mr. Gonzales, did there come a time in this matter when you had a conversation with Mr. Raymond in your office about what he was likely to be looking at on his plea of guilty to felon in possession charges?
>
> A.  Yes.
>
> Q.  Do you recall approximately when that conversation occurred? Do you know if it was before or after his plea?
>
> A.  Oh, it was certainly before his plea.
>
> Q.  Do you recall having a conversation with Mr. Raymond about how he could help himself by cooperating with the federal authorities?
>
> A.  Yes.
>
> Q.  Will you relate to the Court essentially what that conversation involved?
>
> A. I had learned from Mr. Valencia, the prosecutor, that there was an investigation concerning a disappearance and possibly a murder in Rio Rancho.  And I don't remember.  I couldn't quote Mr. Valencia.  It's been too long ago.
>
> Q. Okay.
>
> A.  But my impression was that the government was interested in my client, Benjamin Raymond, and Mr. Valencia inquired whether Mr.

11

Raymond would be interested in cooperating, at least talking to federal authorities.

> Q. And did you relay that interest to Mr. Raymond?

> A. I did.

(Id. at 251-52.)

Based on this testimony, the district court found that the USAO knew Raymond was suspected of being implicated in George's disappearance and murder before Raymond pled guilty to the felon-in-possession charge in October 2004:

> The most direct evidence on this point is Mr. Gonzales' credible testimony that Mr. Valencia spoke to him about seeking Defendant Raymond's cooperation in the Rio Rancho murder investigation at some time before Defendant Raymond entered his guilty plea. Although Mr. Gonzales could not recall the exact date or time at which Mr. Valencia first communicated this request for cooperation regarding the Rio Rancho murder investigation, I find Mr. Gonzales' testimony to be credible, and I further conclude that someone from the USAO (e.g., Mr. Valencia) communicated to Mr. Gonzales a request for Defendant Raymond's cooperation in the Rio Rancho murder investigation before Defendant Raymond entered his guilty plea . . . on October 14, 2004.

(Id. at 166-67 (emphasis added, citations omitted).)

The Government challenges, on three bases, the district court's finding that the USAO knew, prior to October 14, 2004, that Raymond was a suspect in George's disappearance.

12

### a.   The district court misinterpreted Gonzales' testimony

First, the Government argues that the district court misinterpreted Gonzales' direct examination testimony to indicate that Gonzales had one conversation with Raymond, prior to his guilty plea, during which they discussed both the sentence Raymond was "likely . . . looking at" if he pled guilty to being a felon in possession and how Raymond might help himself by cooperating with authorities investigating George's disappearance. The Government argues that Gonzales' testimony was "equivocal" and interprets it, instead, to indicate that Gonzales spoke with Raymond about these matters during two separate conversations: 1) The conversation Gonzales had with Raymond, before his guilty plea, regarding "what he was likely to be looking at on his plea of guilty to felon in possession charges"; and 2) a separate conversation with Raymond, occurring at some unspecified time, "about how he could help himself by cooperating with the federal authorities" investigating George's disappearance. (Id.) Thus, the Government asserts that the district court clearly erred in finding, based upon Gonzales' direct examination testimony, that AUSA Valencia had inquired whether Raymond might be interested in talking to authorities investigating George's disappearance , prior to his guilty plea.

Gonzales' testimony is ambiguous. It can be read both as the district court interpreted it and also as the Government now reads it. However,

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views

13

of the evidence, the factfinder's choice between them cannot be clearly
erroneous.

Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).  Although Gonzales'

testimony is ambiguous, we cannot conclude that the district court's interpretation of that

testimony is implausible.  See id. at 578 (upholding trial court's factual finding,

notwithstanding that the testimony on which the court relied to make that finding was

ambiguous).  Furthermore, the district court was in the best position to weigh the

credibility and demeanor of the witness.  See Snyder v. Louisiana, 552 U.S. 472, 477

(2008).

### b.      Other witnesses contradicted Gonzales' testimony

The United States further argues that the district court erred in relying on

Gonzales' direct examination testimony because the testimony of several other witnesses

contradicted it.  Even so, we cannot say that the district court's decision to credit

Gonzales' testimony over the other witnesses was clearly erroneous. [4]  See La Resolana

---

[4] The United States points to two categories of evidence that contradicted Gonzales'
testimony.  First, AUSA Valencia testified that he talked to Gonzales about Raymond's
possible cooperation with authorities investigating George' disappearance after Raymond
had pled guilty, but before his sentencing.  The district court, however, appears to have
credited instead Valencia's later testimony that he could not "recall" any conversations he
had with Gonzales prior to Raymond's guilty plea.  Based on that testimony, the district
court found that "Mr. Valencia made a good-faith effort to recall the events concerning
his prosecution of Defendant Raymond several years ago," but that "his recollection was
not clear enough to rebut the contrary evidence and corroborating circumstances
presented by the defense in this case."  (Aplt. App. at 174.)

The second category of evidence that may be considered to conflict with
Gonzales' direct examination testimony—that Valencia talked to him about Raymond's

14

Architects, PA v. Reno, Inc., 555 F.3d 1171, 1180 (10th Cir. 2009) (noting district "court

did not commit clear error simply because it chose to credit" one witness's testimony

over another); see also United States v. DeShazer, 554 F.3d 1281, 1287 (10th Cir. 2009)

(noting district court was entitled to credit witness's testimony). "[W]hen a trial judge's

finding is based on his decision to credit the testimony of one of two or more witnesses,

each of whom has told a coherent and facially plausible story that is not contradicted by

extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear

error." Anderson, 470 U.S. at 575 (noting that "only the trial judge can be aware of the

variations in demeanor and tone of voice that bear so heavily on the listener's

understanding of and belief in what is said").

---

possible cooperation with authorities investigating George's disappearance before October 14, 2004—was the testimony of Rio Rancho Detective Hubbard, FBI Agent Griego and ATF Agent Jessen, from whom AUSA Valencia said he learned that Raymond had been implicated in George's disappearance. These three law enforcement officers testified that they did not exchange information about George's disappearance and murder until at least November 2004, a few weeks after Raymond pled guilty. While the district court found "that Special Agent Griego and Agent Jessen credibly testified that it was not until November 2004 that they learned of Defendant Raymond's status as a suspect in Detective Hubbard's investigation into Mr. George's disappearance," the court further noted that "their testimony in this regard does not preclude a reasonable inference that such knowledge reached the USAO through other, alternative channels of communication with state and local law-enforcement officials before that date." (Id.) And the record supports this suggestion. It was ATF Agent Foutz, and not Jessen, who was the ATF case agent working with Valencia to prosecute Raymond. And, although Detective Hubbard was the Rio Rancho detective investigating George's disappearance, Lt. Noel Snow appears to have assisted Hubbard a great deal, at least initially. So there were a number of officers investigating the murder who did not testify, and so did not deny giving the USAO information, before October 14, 2004, that authorities suspected that Raymond was involved in Henry's disappearance.

15

### c. Whether Gonzales later contradicted his direct examination testimony

Lastly, the United States argues that the district court clearly erred in relying on

Gonzales' direct examination testimony because it was "internally inconsistent"; that is,

Gonzales' later testimony contradicted his direct examination testimony on which the

district court relied.  On cross-examination, Gonzales testified:

> Q.  Do you have any notes in your file indicating when Mr. Valencia discussed this issue with you?
>
> A.  No.
>
> Q.  So you have basically a vague recollection that you had some sort of discussion with him?
>
> A.  I know I had that discussion with him.

(Aplt. App. at 256-57.)  The Government asserts that, by this cross-examination

testimony, Gonzales indicated, contrary to the district court's interpretation of his direct

examination testimony, that Gonzales actually had no idea when this conversation with

Valencia occurred.  While this cross-examination testimony could be interpreted that

way, the district court instead interpreted it in light of Gonzales' direct examination

testimony to indicate that the conversation Gonzales had with AUSA Valencia occurred

prior to the guilty plea, but that Gonzales was unsure of the exact date on which that

conversation occurred.

Finally, during redirect, Gonzales testified:

16

Q. And was it your understanding at the time of sentencing that the government knew about this murder in Rio Rancho and Ben Raymond's involvement?

A. The reports I got from Mr. Valencia told me, of course, the federal government knew about the murder in Rio Rancho and felt that Ben Raymond was involved. I don't know when the government knew that. I didn't have discussions with Louis Valencia --- well, I don't know when I had those discussions.

(Id. at 260.)

As the Government argues, Gonzales' testimony could be understood to mean that he did not know when---pre- or post-guilty plea---that Valencia knew Raymond was suspected of being involved in George's murder. Or, read in light of the district court's interpretation of Gonzales' direct testimony that the prosecutor raised this issue with Gonzales prior to Raymond's guilty plea, Gonzales' testimony on redirect might mean instead that he did not know the exact date on which the government discovered this information, but that Valencia had raised the issue with Gonzales prior to the plea agreement. This is the interpretation the district court gave Gonzales' testimony as a whole, finding "that someone from the USAO (e.g., Mr. Valencia) communicated to Mr. Gonzales a request for Defendant Raymond's cooperation in the Rio Rancho murder investigation before Defendant Raymond entered his guilty plea" in the 2003 felon-in-possession case. (Id. at 167 (emphasis added).). Although Gonzales' testimony is ambiguous, the district court's interpretation is plausible. Therefore, we cannot conclude it was clearly erroneous. See Anderson, 470 U.S at 574, 578-79.

17

**2. Evidence linking Raymond's 2003 federal felon-in-possession prosecution to the Rio Rancho Police Department's investigation of George's disappearance**

There is additional evidence that not only supports the district court's interpretation of Gonzales' testimony, but also supports the court's finding that the USAO knew that Raymond was suspected in George's disappearance before October 14, 2004. For example, based on evidence of the interconnected nature of the 2003-04 felon-in-possession prosecution and local officials' investigation into George's disappearance, the district court determined that the USAO must have been aware, prior to October 14, 2004, that Raymond had been implicated in George's disappearance.

> Thus, at the time the USAO brought the indictment against Defendant Raymond in [the federal felon-in-possession case] on October 17, 2003, there was a pending investigation into Mr. George's disappearance that necessarily involved some degree of overlap and coordination among several state and local law-enforcement agencies, prosecutors, and correctional authorities. All of the Defendants in the present case, as well as [Mudersbach] and Ms. Robinson, had been detained in connection with criminal charges in state court before that date, and thus it was necessary for some if not all of the above agencies to coordinate with one another in order to make decisions about where and under what conditions to detain the above individuals, arrange for interviews while they were in custody, identify the offenses with which to charge them and identify the proper jurisdiction in which to charge them. Under these circumstances, it is highly unlikely and not plausible that a federal prosecutor or law enforcement agency could have obtained police reports regarding Defendant Raymond's arrest by APD officers on June 29, 2002, and related criminal-history information necessary to bringing the charge of being a felon in possession of a firearm on that date, without also coming across some link to, or background information concerning, the [Rio Rancho Police Department's] pending investigation into Mr. George's disappearance and related racketeering activity attributed to the Aryan Brotherhood.

18

(Aplt. App. at 129; see also id. at 168 ("The evidence of record supports a reasonable inference that the information concerning the nature and existence of the [Rio Rancho Police Department's] investigation into Mr. George's disappearance, as well as Defendant Raymond's alleged involvement in that disappearance and related racketeering activity, was readily available to Mr. Valencia, others in the USAO, the ATF case agent in [Raymond's felon-in-possession case], and the District Attorney's Office before the date of Defendant Raymond's plea agreement in that case.").) Thus, the district court held that,

> [w]hile there is no "smoking gun" confirming beyond doubt that the USAO received copies of the written reports of these investigations before October 14, 2004, there is an abundance of indirect, circumstantial evidence to support a reasonable inference that the USAO knew of the information in such reports before that date; such indirect, circumstantial evidence is sufficient to meet Defendant Raymond's burden of proof on this issue.

(Id. at 169-70.)[5]

---

[5] The district court bolstered its finding by noting that

> [t]he cross-examination of [Rio Rancho] Detective Hubbard also revealed that there may have been some delay in the preparation of his written reports. For example, Detective Hubbard's report concerning the follow-up interview with Ms. Robinson that occurred on July 10, 2002, was not prepared until November 12, **2004**. Thus, it is reasonable to infer that Detective Hubbard relied, at least in part, on informal oral communications to conduct his investigation of Mr. George's disappearance prior to the federal involvement in November 2004, when more thorough documentation was requested.

(Aplt. App. at 138.) This, then, might help explain why there is no written document establishing that local authorities shared information about Raymond's suspected involvement in George's disappearance before Raymond's October 14, 2004, guilty plea.

19

"[D]rawing reasonable inferences and conclusions from the evidence [is] within the province of the district court." United States v. Munoz-Nava, 524 F.3d 1137, 1145 (10th Cir. 2008) (quotation omitted). Here, the inferences the district court drew were not clearly erroneous.

The district court premised its inference that the USAO must have known, before October 14, 2004, that Raymond was a suspect in George's disappearance on at least two additional facts: 1) federal officials were working with the APD to prosecute Raymond in 2003 for being a felon in possession of a firearm; and 2) APD officers were in contact with Rio Rancho officials, who suspected Raymond's involvement in George's disappearance.

### a. Evidence that federal authorities were working with APD to prosecute Raymond, in 2003 and 2004, for being a felon in possession of a firearm

Although the evidence before the district court did not specifically identify the APD's exact connection with the USAO's prosecution of Raymond for being a felon in possession of a firearm, it cannot be doubted that there was a definite link between the two agencies. The federal felon-in-possession charge against Raymond originated from the APD officers who arrested Raymond on June 29, 2002, for trying to buy a car using fraudulent checks. After discovering that Raymond was armed at the time of his arrest, and that he had prior felony convictions, APD officers contacted

> Detective Garcia of APD Intelligence Unit . . . in regards to "Project Exile."
> As a result of this conversation, it was decided that [Defendant] Raymond
> would be booked into [the Bernalillo County Detention Center] on

[outstanding] felony warrants and on charges that would be forthcoming from the U.S. Attorneys [sic] Office regarding felon in possession of a handgun.

(Aplt. App. at 124-25.)

> "Project Exile" . . . involved a series of monthly meetings between the USAO and the District Attorney's Office in Bernalillo County. At such meetings, those in attendance would go over reports for the purpose of identifying cases which warranted federal prosecution by the USAO or further follow up by the ATF. According to Mr. Valencia, "Project Exile" also involved instances where the local police department would call ATF and ask them to present the case to the U.S. Attorney's Office. In addition, there was a Violent Crime Impact Task Force, where the ATF was embedded into a task force that APD had. Mr. Valencia [testified] that he was not sure whether he discussed any charges or criminal history relating to Defendant Raymond's arrest on June 29, 2002, with the District Attorney's Office, but he acknowledged that reports relating to that arrest might have been brought to his attention during one of the "Project Exile" meetings.

(Id. at 144-45 (quotations, citations omitted).) Valencia further testified that, although he did not know exactly how Raymond's felon-in-possession case came to the USAO for prosecution, it is likely that APD officers contacted the ATF, which would have presented the case to the USAO, where Valencia was the "firearms unit supervisor" through whom most weapons cases were channeled. This evidence, then, clearly established a pathway by which the USAO received from the APD the information underlying the USAO's felon-in-possession prosecution against Raymond.

### b. Evidence that APD was in contact with Rio Rancho officials who had identified Raymond as a suspect in George's disappearance

The evidence before the district court also clearly established that APD knew Rio Rancho authorities were investigating George's disappearance; in fact, APD notified Rio

21

Rancho police at the time they arrested Raymond and Robinson, on June 29, 2002. APD officers did so after Josie Robinson, having been arrested with Raymond, told APD officers that she was working with Rio Rancho authorities "on a case." (Id. at 84.) In fact, it appears that APD Officer Power, who arrested Raymond, had a fairly detailed conversation with Rio Rancho Lt. Noel Snow about each department's respective investigations involving Raymond and Robinson.[6] And it is undisputed that by this time Rio Rancho authorities had already identified Raymond as a suspect in George's disappearance.

Further, after discovering that APD officers had taken Raymond into custody, Rio Rancho Detective Hubbard, who was investigating George's disappearance, interviewed Raymond. The district court noted that this "would have entailed some communications with corrections officials or the agency responsible for detaining Defendant Raymond at this time." (Id. at 138.)

---

[6] APD Officer Power notified Snow that APD had arrested Robinson and "her boyfriend" Raymond "for attempting to purchase a vehicle with a fraudulent check," and that Robinson had told APD that she was "working with [Snow] on a case," so Power might want to contact Snow. (Aplt. App. at 84.) Power also told Snow that both Raymond and Robinson were armed at the time of their arrest. Snow, in turn, told Power that Raymond's possession of firearms was a probation violation and a crime in light of his prior convictions; Power was already aware of this. Snow suggested that Power "might want to check out the validity of the temporary tag displayed on the vehicle" that Robinson and Raymond were driving, because when Rio Rancho authorities searched both Robinson's and Raymond's apartments, they "discovered and seized evidence that would lead us to that conclusion." (Id. at 85.) Power asked if Snow wanted to interview either Raymond or Robinson, Snow indicated that they probably would later. When Snow reported this to Rio Rancho Detective Hubbard, the detective wanted to interview Robinson as soon as possible.

22

### c. Inferences the district court drew from these facts

Relying on these facts---that the USAO was working with APD officers to prosecute Raymond for being a felon in possession of a firearm, that APD was in contact with Rio Rancho authorities investigating George's disappearance, and Rio Rancho authorities identified Raymond as a suspect within days of George's disappearance---the district court inferred that federal authorities, prior to Raymond's October 14, 2004, guilty plea, must have known that he had been implicated in George's disappearance. Drawing inferences in the light most favorable to the district court's determination, see United States v. Beltran, 571 F.3d 1013, 1020 (10th Cir. 2009) (reviewing application of a sentencing enhancement under the guidelines), we cannot say that the district court's inference was unreasonable or clearly erroneous. See Holdeman, 572 F.3d at 1192 (noting it is the province of the district court to draw inferences from the evidence).

### 3. USAO's common practices

Providing some additional support for the district court's interpretation of Gonzales' direct examination testimony and the court's finding that the USAO knew, before October 14, 2004, that Raymond was a suspect in George's disappearance, the district court took judicial notice of "Section 9-27.420 of the United States Attorney's Manual (rev. 1997)." (Aplt. App. at 167.) That manual section provides that, "'[i]n determining whether it would be appropriate to enter into a plea agreement, the attorney for the government should weigh all relevant considerations, including . . . [t]he defendant's willingness to cooperate in the investigation or prosecution of others.'" (Id.)

23

Furthermore, the district court found that "[t]here is evidence suggesting that it is a common practice of the USAO in the District of New Mexico to charge defendants who were similarly situated with Raymond initially with gun crimes and then solicit their cooperation before bringing additional charges or negotiating a plea agreement," citing the USAO's prosecution of Wasson, Mudersbach and Robinson. (Id. at 167-68.) Based upon this evidence, the district court noted that it would have been unusual, and contrary to its policy, for the USAO to enter into a plea agreement with Raymond without investigating his possible involvement in other criminal activity. While the Government argues that the district court could just as easily have drawn contrary inferences from the evidence, that does not warrant us finding that the inferences the district court did draw were unreasonable or clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

4.     **District court's disbelief of the Government's explanation for how the USAO finally discovered that Raymond was a suspect in George's disappearance**

Lastly, the district court based its finding that the USAO knew of Raymond's involvement in George's disappearance before October 14, 2004, in part on the court's disbelief of the Government's explanation of how AUSA Valencia discovered that Raymond was a suspect in George's disappearance, just a few weeks after Raymond's guilty plea. Valencia's explanation was this: Within just a few weeks of Raymond's October 14, 2004, guilty plea, FBI Agent Griego was "cold calling" local law

24

enforcement agencies in New Mexico, asking if they had any cases involving the Aryan Brotherhood. When he happened to call Rio Rancho Detective Hubbard, Hubbard told Griego about the investigation into George's disappearance. At Agent Griego's urging, Detective Hubbard then faxed information about the George investigation to ATF Agent Jessen. It was ATF Agent Jessen who then forwarded this information on to AUSA Valencia (even though ATF Agent Foutz, and not Jessen, was the case agent with whom Valencia was working to prosecute Raymond). According to Valencia, it was only after he received this information, following Raymond's guilty plea, that he asked defense attorney Gonzales if Raymond might be interested in cooperating with authorities investigating George's disappearance.

The district court found this story of how the USAO discovered that Raymond was a suspect in George's disappearance, by happenstance and within just a few weeks of Raymond's guilty plea, to be too coincidental:

> To draw the . . . inference that the USAO did not know anything about the various pending investigations by state and local officials with regard to Ms. Robinson, Defendant Raymond, their alleged involvement in Mr. George's disappearance, and Defendant Raymond's association with the racketeering activities of the Aryan Brotherhood at the time he entered his guilty plea in [the 2003 federal felon-in-possession prosecution], one would have to rely on a remarkably improbable series of coincidences: (a) the USAO managed to learn the details of Defendant Raymond's involvement in the incident of June 29, 2002, without simultaneously learning of Ms. Robinson's involvement in that incident or the communications between APD and [Rio Rancho police] that she prompted at that time; (b) despite the efforts by law enforcement agencies to "sell" the case for federal prosecution through "Project Exile" and the like, and despite the pressing need to develop evidence in support of the effort to have Defendant Raymond's conditions of pretrial release revoked, the

25

USAO entered into the plea agreement in [the 2003 felon-in-possession prosecution] without first inquiring about Defendant Raymond's reported association with the "Aryan Brotherhood" or any additional crimes that he may have committed; (c) despite the USAO's usual practice of soliciting and assessing a defendant's cooperation <u>before</u> entering into a plea agreement, the USAO did not do so in that case, and (d) instead the USAO learned for the first time of the reports of Defendant Raymond's involvement in the disappearance of Mr. George through a "general canvassing" or "cold call" initiated by Special Agent Griego less than a month after the plea hearing but in ample time to alert the Court of these reports for purposes of the sentencing hearing.

I do not accept the theory that the Government's knowledge arose through such a series of coincidences. Rather, I find that Mr. Gonzales' testimony provides a more logical explanation that is corroborated by the surrounding circumstances.

(Aplt. App. at 172-73.)

We must defer to the district court's determination that the United States' explanation for when and how the USAO discovered that Raymond was a suspect in George's disappearance was unbelievable. "[D]eterminations of credibility and demeanor lie peculiarly within a trial judge's province, and . . . in the absence of exceptional circumstances, we . . . defer to the trial court." <u>Snyder</u>, 552 U.S. at 477 (quotations, citations, alterations omitted).

Having disbelieved the United States' explanation, the district court was left with the evidence indicating that the USAO knew that Raymond had been implicated in George's disappearance before October 14, 2004. <u>Cf. Allen</u>, 57 F.3d at 1540 (noting, in dicta, that the petitioner had shown that the "government potentially breached the plea agreement" by offering an "obvious explanation" of his prison classification---the

26

Government used evidence of counts against petitioner that it had dismissed, contrary to the terms of petitioner's plea agreement---and the Government "offered no alternative justification").

### 5. Conclusion

Because the evidence presented to the district court was ambiguous and disputed, this court, based on the cold record before us, might have made different factual findings than those the district court made. However, in this case our standard of review is determinative. Under "significantly deferential" clear error review, Concrete Pipe, 508 U.S. at 623, we cannot disturb the district court's factual finding that the USAO knew, prior to October 14, 2004, of Raymond's conduct implicating him in the disappearance and murder of George. We, therefore, AFFIRM the district court's decision to dismiss the five charges alleged in the 2007 indictment against Raymond stemming from George's disappearance and murder.[7]

### B. Whether the United States breached the 2003 plea agreement by charging Raymond in the 2007 indictment with two offenses stemming from the attempted murder of Mudersbach

The 2007 indictment also charged Raymond with conspiring and attempting to murder John Mudersbach in furtherance of racketeering activity, contrary to 18 U.S.C.

---

[7] In light of this conclusion, we need not address here whether the USAO's knowledge, prior to October 14, 2004, of Raymond's involvement in the Aryan Brotherhood and with suspected check fraud, sufficed to preclude charging Raymond, in the 2007 indictment, with the offenses stemming from George's disappearance and murder. We address that evidence next, however, as it pertained to the charges against Raymond stemming from the attempted murder of Mudersbach.

§§ 2, 1959(a)(5). These charges present a different issue. We conclude that the district court legally erred at the outset of its analysis of these charged offenses when the court interpreted the relevant language from the 2004 plea agreement---that "the United States will not bring additional charges against [Raymond] arising out of the defendant's conduct now known" to the New Mexico USAO (Aplt. App. at 44)---to require "an inquiry as to whether <u>any</u> of the essential elements of the 'additional charges' the USAO brought against [Raymond] in [the 2007 case] <u>originate from</u> conduct known to the USAO" on October 14, 2004. (<u>Id.</u> at 164.) <u>See</u> <u>Villa-Vazquez</u>, 536 F.3d at 1196 (reviewing de novo whether government breached its plea agreement).

While the United States could have written the plea agreement in that manner, it did not do so in this case. Instead, the plea agreement at issue here indicated that the USAO would not "bring additional charges against [Raymond] arising out of the defendant's <u>conduct</u> now known." (<u>Id.</u> at 44.) Although, as the district court noted, the USAO knew, at the time of Raymond's guilty plea, that he was affiliated with the Aryan Brotherhood and that he was suspected of check fraud, those facts do not involve affirmative conduct on his part linking him to Mudersbach's attempted murder. Moreover, we agree with the Government that the parties could not have understood the plea agreement's language to mean that, just because the Government knew that Raymond had been affiliated with the Aryan Brotherhood, that fact would immunize him from liability for any crimes committed as part of his involvement with that group.

28

There is no evidence in the record to indicate that, at the time Raymond pled guilty to the felon-in-possession offense on October 14, 2004, the USAO knew of any conduct Raymond had undertaken that would have connected him to the attempted murder of Mudersbach. Because there is no such evidence, we need not remand this case to the district court to permit that court to consider, in the first instance, the record evidence under the correct interpretation of the plea agreement's relevant language. We conclude, instead, that the district court legally erred in dismissing the 2007 indictment charging Raymond with the two offenses stemming from that attack on Mudersbach.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to dismiss the 2007 charges against Raymond that stem from George's disappearance and murder, Counts 1, 2, 3, 4 and 5. But we REVERSE the dismissal of the indictment as to the two charges against Raymond stemming from the attempted murder of Mudersbach, Counts 7 and 8. In light of that, we REMAND this case to the district court for further proceedings consistent with this decision.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge

29

09-2101, *United States v. Raymond*

**GORSUCH, J.,** concurring in part and dissenting in part.

The majority's analysis proceeds in two movements. The first movement affirms the district court's dismissal of the charges associated with the George murder. But the second movement sounds a different note, reversing the district court and reinstating the charges associated with the Mudersbach attempted murder. I agree with the second half of the majority's opinion and join its decision to reinstate the Mudersbach attempted murder charges. Respectfully, however, I submit that the same logic that compels this conclusion also compels the reinstatement of the George murder charges.

I

Mr. Raymond has a long and violent criminal history. It is a history that includes battery, aggravated burglary, armed robbery, violations of drug and gun laws — and now murder. Many of these crimes appear linked to his membership and involvement in the Aryan Brotherhood. The current case against Mr. Raymond started in 2007 when the New Mexico United States Attorney's Office (USAO) charged him, and a grand jury indicted him, for various crimes in furtherance of Aryan Brotherhood racketeering activity, including the successful murder of Henry George and the attempted murder of John Mudersbach.

According to the USAO's charging documents, when Mr. Raymond and his associates heard in 2002 that Mr. George had recently spoken to law enforcement officials, they went to Mr. George's apartment and beat him until he admitted to

"ratting." After extracting his confession, the group took Mr. George into the desert near Rio Rancho, New Mexico, where they forced him to dig a large hole. Mr. Raymond then tried to choke Mr. George to death; when that didn't work, he or one of his co-conspirators shot and killed Mr. George. Before leaving the scene, the group buried Mr. George in the hole he had dug. A few months later, Mr. Raymond caught wind that Mr. Mudersbach, a then-incarcerated member of the Aryan Brotherhood, had "snitched" to local authorities about the George murder. As retaliation, Mr. Raymond ordered Jeremiah Looney, another of his incarcerated cohorts in the Brotherhood, to murder Mr. Mudersbach. Mr. Looney responded by attacking Mr. Mudersbach with a barbell, "beating him within an inch of his life." App. at 54-55.

Mr. Raymond sought dismissal of the USAO's racketeering charges against him. He argued that the charges were barred by a plea agreement he reached with the government on an unrelated and relatively modest firearms charge in 2004. In the 2004 plea agreement, the USAO promised that it would "not bring additional charges against the defendant arising out of the defendant's conduct now known to the [USAO]." App. at 44. The district court agreed with Mr. Raymond's motion and dismissed the 2007 racketeering indictment in its entirety.

## II

My colleagues hold that the district court applied an incorrect legal standard in dismissing the charges associated with the Mudersbach attempted murder. I agree. The district court asked "whether *any* of the essential elements of the" government's

2

attempted murder charges "*originate from* conduct known" to the USAO as of the date of the plea agreement in 2004.  Maj. Op. at 28.  This standard, the majority explains, does not reflect the terms of the parties' plea agreement, which instead barred the government from bringing new charges "arising out of the defendant's *conduct* now known" to the USAO, as of the date of the 2004 plea agreement.  *Id.*

While the difference between these two standards might not seem significant at first blush, as the case played out in the district court the difference proved dispositive. The district court dismissed the Mudersbach attempted murder charges because an essential element of those charges required the government to prove Mr. Raymond's participation in a racketeering enterprise — here, as alleged in the indictment, the Aryan Brotherhood.  Because the USAO knew Mr. Raymond was a member of the Aryan Brotherhood in 2004, the district court reasoned, dismissal of the Mudersbach attempted murder charges was required.  Simply put, the USAO's knowledge of Mr. Raymond's *status* within the Brotherhood, as of 2004, precluded the current prosecution against him. As the majority correctly explains, however, the terms of the plea agreement bar the government from bringing charges that arise from *conduct*, not mere *status*, known to the USAO at the time of the 2004 plea.

Having identified this error in the legal standard employed by the district court, my colleagues do not remand the matter back to the district court for application of the correct legal standard in the first instance.  They do not because, as they explain, the record before us is clearly devoid of evidence that the USAO *knew* of any of Mr.

3

Raymond's *conduct* in connection with the Mudersbach attempted murder at the time of the 2004 plea. Accordingly, the majority reverses the district court's decision and orders the reinstatement of the Mudersbach charges against Mr. Raymond.

III

The same analysis that leads to the reinstatement of the Mudersbach charges should also lead to the reinstatement of the George charges. The district court analyzed the George charges under the same erroneous legal standard it used when assessing the Mudersbach charges. And, under the correct legal standard, the record contains no more evidence that the USAO, at the time of the 2004 plea agreement, knew of Mr. Raymond's conduct in connection with the George murder than it did his conduct in connection with the Mudersbach attempted murder.

*First*, the district court applied its erroneous legal standard to both the George charges and the Mudersbach charges. Indeed, the district court's opinion analyzed the George and Mudersbach charges together, in one section, introducing its incorrect legal standard at the outset of its common discussion. Under the district court's standard, the USAO's knowledge in 2004 of Mr. Raymond's *status* as a participant in the Aryan Brotherhood was enough to require dismissal of all the charges against him. Thus, if reversible legal error infects the district court's analysis of the Mudersbach charges (as it does), it no less infects the district court's treatment of the George charges. The two halves of this whole cannot be peeled apart, and so reversal of the whole case, not just half of it, should follow.

4

*Second*, reviewing this case under the correct legal standard, there is no more evidence in the record that the USAO knew, at the time of the 2004 plea, of Mr. Raymond's *conduct* in connection with the George murder than it did his *conduct* in connection with the Mudersbach attempted murder. Indeed, it knew nothing about his role in either attack. Any contrary conclusion is thus clearly erroneous, and reinstatement of the George charges should follow.

The record in this case reveals that the Assistant U.S. Attorney who struck the 2004 plea agreement with Mr. Raymond testified that he had no knowledge of Mr. Raymond's involvement in the George murder until after the agreement. App. at 674. Two federal agents involved in the investigation said the same thing. App. at 303, 308. Their testimony was corroborated by a fax date stamp reflecting that state authorities first passed along information linking Mr. Raymond to the George murder only after the 2004 plea deal. App. at 75. And all of this testimony was corroborated by the local investigating officer who explained that he hadn't consulted with federal authorities about the George murder until well after the plea deal was consummated. App. at 280.

In the face of this proof, Mr. Raymond points to the testimony of his defense attorney, Benjamin Gonzales, who indicated that the USAO, at some point, asked him whether Mr. Raymond might assist with a possible investigation into Mr. George's "disappearance." App. at 251. From this, Mr. Raymond asks us to infer that the USAO must've known, before the plea agreement, of his involvement in the George murder.

5

At least two problems confront this argument. In the first place, there is no evidence in the record suggesting that the conversation occurred before, rather than after, the 2004 plea — and thus no evidence that the USAO knew anything of Mr. Raymond's conduct in connection with the George murder before agreeing to the firearms plea deal. To be sure, Mr. Raymond urges us to defer to the district court's estimation that the conversation took place before the plea. But for us to uphold the district court's inference, it "must be [based on] more than speculation and conjecture." *United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005) (internal quotation marks omitted). In this case, speculation and conjecture about the timing of Mr. Gonzales's conversation with the USAO is all we have.

Even if we could overlook this problem, another remains. If the government's request for help in connection with an investigation into George's disappearance suggests anything, it suggests that the USAO did *not* know Mr. Raymond kidnapped and killed Mr. George. If the USAO did *know* those things, after all, it would hardly have needed to solicit Mr. Raymond's assistance with its investigation into Mr. George's "disappearance." At most, the government's request for assistance suggests only that the USAO suspected Mr. Raymond of possessing helpful information about George's disappearance. And under the plea agreement that is not enough. It isn't enough that the government, *Casablanca*-style, might have considered Mr. Raymond one of the "usual suspects" to be rounded up and questioned about a disappearance linked to the Aryan Brotherhood. To be barred from proceeding with its indictment, the USAO had to *know*

6

that Mr. Raymond engaged in the *conduct* of kidnapping and killing George. There is simply no *evidence* that it did.

To uphold the district court and dismiss the George murder charges, then, we would have to accept Mr. Raymond's piling of one speculative inference (that the Gonzales conversation took place before the plea) on another (that the prosecutor's comments somehow signaled knowledge of Mr. Raymond's conduct, rather than suspicion of his usefulness as an informant). None of this we can do. *See United States v. Hilliard*, 31 F.3d 1509, 1521 (10th Cir. 1994) (explaining that "[w]e are unwilling to stack inference upon inference" to uphold a district court's factual findings); *cf. United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007) ("[W]e will not uphold a conviction obtained by piling inference upon inference."). Mr. Raymond asks us to believe that the USAO decided to give Mr. Raymond a free pass on a murder charge, despite *knowing* he kidnapped and killed Mr. George, in exchange for a guilty plea to an unrelated and relatively modest gun charge. While maybe not an entirely unfathomable scenario, Mr. Raymond fails to provide more than speculation that anything so unlikely actually occurred.

In response to all this, Mr. Raymond stresses that *state and local* authorities had information linking Mr. Raymond to the George murder before the date of the 2004 plea agreement. But that is not enough either. Under the terms of the plea, the USAO was barred only from pursuing conduct known to it, not conduct known to state and local authorities.

7

Mr. Raymond replies that law enforcement officials frequently coordinate their investigative work and so the USAO likely knew what state and local authorities knew. But this, too, is just speculation — and speculation contradicted by all of the competent record evidence. Every investigator called as a witness, from every law enforcement agency involved, testified that the USAO received no information on the George murder until *after* the 2004 plea agreement. To be sure, Mr. Raymond argues that other federal officials, who did not testify, might have learned what state and local authorities knew *before* the plea agreement. But, yet again, he supplies no evidence to support that speculation. And protesting that the right officials didn't testify does Mr. Raymond no good anyway. He had the chance to call the witnesses he wished and, as the movant seeking dismissal of the indictment, he bore the burden of proving that the USAO's charges arise out of conduct it knew of at the time of the plea. *Allen v. Hadden*, 57 F.3d 1529, 1534 (10th Cir. 1995). That he simply did not do.

Moreover, if we could fairly impute the knowledge of state and local officials to the USAO, as Mr. Raymond suggests and the majority seems to agree, we would have to affirm the dismissal not just of the George charges. We would also likely have to affirm the dismissal of the Mudersbach charges. The majority indicates that the only information the *USAO* knew about Mr. Raymond's conduct in connection with the Mudersbach attack was Mr. Raymond's status as an affiliate of the Aryan Brotherhood. But there are loads of other things that *state and local* investigators knew about Mr. Raymond's involvement in the attack on Mr. Mudersbach. They knew that Mr.

8

Mudersbach was a member of the Aryan Brotherhood. They knew that Mr. Mudersbach had implicated Mr. Raymond in the George murder. And they knew that Mr. Mudersbach had been attacked in jail by another Aryan Brotherhood member, presumably for "snitching" on Raymond. If the knowledge of state and local officials about the George murder could be fairly imputed to the USAO, presumably the same should hold true for the Mudersbach attempted murder, thus precluding prosecution of either crime. The reason why we can't impute the knowledge of local and state officials to the USAO in *either* case, of course, is that any such imputation would be based on speculation. There is simply no evidence in this record that the USAO, as opposed to state and local officials, knew of Mr. Raymond's involvement in either crime.

* * *

The district court applied the wrong legal standard to both the George and Mudersbach charges. Applying the correct standard, the record is clearly devoid of evidence that the Mudersbach charges arise from *conduct known* to the USAO at the time of the 2004 plea agreement. Exactly the same must also be said of the George charges. Accordingly, I would reinstate not just half but all of the indictment against Mr. Raymond.

9